at all, appellate number 25-1644. Take your time, get yourself settled, and when you're ready, come sit with me. Good morning, Your Honor, and may it please the Court. John Gore for the RMC and the Pennsylvania Republican Party. The Court's permission, I'd like to reserve three minutes of my time for rebuttal.  In 2019, the bipartisan General Assembly made voting even easier when it enacted no-excuse mail voting for all Pennsylvania voters. Would you stop right there, please, just because I found the use of bipartisan a fascinating usage, especially in this context. And I have some familiarity over a lot of years as a Pennsylvania citizen with the General Assembly. Is the legislative record, the legislative history at all, tell us anything about how this compromise and why this compromise was reached? Yes, it does, Your Honor. It tells us that because Pennsylvania was due to modernize its election laws more broadly. And Democrats and Republicans in the General Assembly came together to do that. It was the most significant piece of voting and election legislation that Pennsylvania had enacted in about 50 years. And it was signed into law by a Democratic governor. So it was a bipartisan act. And as part of that historic legislation, the General Assembly, as I mentioned, enacted universal voting by mail for all Pennsylvania voters. And it extended to voting by mail the same ballot casting rules that generally have governed absentee voting for decades. And those rules include the requirement that voters fill in, date and sign the ballot declaration on the outer envelope. More than 99 percent of mail voters have complied with the straightforward requirement to date their ballots. And to aid those who did not, the secretary redesigned the ballot envelope in 2024. Well, that was before the district court. And I know we can take judicial notice, but that change was not before the district court. Am I correct? That is not correct. We did put that change before the district court. We provided evidence of that and we showed the district court the change that had been made. Did it change the district court's perspective in any way? Did the district court distinguish the 2024 configuration from just the general date requirement? The district court did not. The district court did not address the 2024 redesign at all. And we think that's an indefinite basis for reversal here because that is the governing version of the date requirement. And it's shown in the results of the 2024 election. So you're also making representations about the results of the 2024 election. Was that before the district court? Yes, they were. And there are representations, I think, by one of the amicus about the fact there's still mistakes. Either omissions or mistaken sequencing of numbers. Am I right? That is correct. So we still have voters who are not having their ballots counted, correct? That is correct. The noncompliance rate with the date requirement has continued to go down in recent years and went down dramatically from 2022 to 2024. It's now for male voters 0.23%. But if a person's vote, and you and I have had this case together before, and you might recall there was an intervener who tried to come in who was someone who tried to get elected in a small community, and the counting of those mail-in ballots had a consequence to the outcome of that case. Do you recall that? I do recall that. So should we really be focusing on the fact that it's only a few people when in a community like that it would have been consequential? The point of saying it's 99% is the Secretary and the state have taken several significant steps to make compliance easier, and that includes the 2024 redesign, which simplifies the voters' task of simply filling in the two-date month and day, including Mark Box. But enforcing that still maintains it's a requirement under Pennsylvania law, but noncompliance with it still leads to the same outcome, which is not having the ballot counted. Isn't that a sufficient injury under Anderson-Burdick that requires the court to weigh the state's interest? No, it's not, Your Honor, because Anderson-Burdick is about the burden of compliance, not the consequence of noncompliance. But there are three circuits who have focused when looking at, first of all, Anderson-Burdick itself talks about the injury from the regulation, and three other circuits have acknowledged the consequence, risk of noncompliance with their particular schemes as being sufficient. So it's your view that that's not enough? No, it's not enough, and I think Crawford makes this clear. Crawford makes clear that failure to have a photo ID resulted in voters not being able to cast their ballot when they showed up to the polling station. But they were looking at the burden of getting that documentation, and it was a plurality case, correct? Yes, although it's clear from the concurrence from Justice Scalia that there was a majority on this point. That proves our point. The burden is the burden of compliance. How difficult is the rule to comply with, not what is the consequence of noncompliance? So what do we do with the language in Anderson-Burdick that talks about the injury that could result from the regulation? Well, the injury is the burden. The injury is how significant is the burden, and does the burden itself, is it significant enough to trigger constitutional scrutiny in the first instance? Let's stop right there. What does burden mean, specifically in this case? What is the burden? The burden is how difficult is it to fill in the month and day in the clearly marked boxes under the 2024 redesign or to handwrite the date even before the 2024 redesign? So it's effort expended? How much effort needs to be expended to comply? That's what you define burden. Is it? Yes. All right. Then, because my follow-up question is going to be, in generally accepted language, in plain terms, is a burden, as we would understand it to be, necessarily burdensome? Crawford makes clear, and this Court's decision in Mazo makes clear, that a burden that is only tantamount to the usual burden of voting does not even implicate the Anderson-Burdick framework. So at the threshold, the district court erred in applying that framework to this case. I realize my question is purely semantic, but that was its purpose. I spent a little time with dictionaries over the weekend on this. And when we use the word burden, in constitutional cases, it definitely has some meaning. So does burdensome. So does burdensome really get us into just some kind of quantification of the burden? Effort, I think, was the word that my colleague used in her question a minute ago. I think we could use effort or difficulty at the threshold to determine whether the burden is a usual burden of voting, such that it's outside of the Anderson-Burdick framework under Crawford, under Mazo, even under the Supreme Court's decision in Brnovich, and this Court's decision in PAN-AACP, which Judge Schwartz referenced earlier. That failure to comply with these nondiscriminatory ballot-casting regulations does not deny anyone the right to vote. So we could think of it as how difficult or how much effort is involved in complying with the rule at the threshold question. If it's a usual burden of voting, then Anderson-Burdick doesn't even apply. If it's something more than that, then you get into the Anderson-Burdick framework and balance the interest. We know that the right to vote encompasses the right to have a vote counted, and it sounds like you're saying the state requirement doesn't burden the right to vote because it's a simple task to fill out a date on the secrecy envelope. But if failure to do that simple task prevents the vote from being counted, isn't that itself a burden? No, I disagree, Your Honor. And I think this Court's decision in PAN-AACP, where the date requirement was previously before this Court and this Court upheld it, proves exactly that. There's no right to have a ballot counted if it's not completed in accordance with the state law rules for completing it. Just like there's no right to cast a ballot in person if you show up a day late at the polls to vote by mail or to vote absentee, you have to comply with the rules that the state has set out. So there's no right to have it counted if you don't comply with the rules. The state sets out the rules. It strikes me, again, as someone pretty familiar with Pennsylvania state government, that none of the counties are parties in this lawsuit. None of the counties seem to actively participate. And it is at the county level that the so-called mechanics of the actual voting process takes place. And do you agree that, as I read in the briefing, that there is actually a variety of approaches as to how those mechanics apply statewide? But most importantly, in whether or not there's an opportunity for a voter who has cast a vote that has a mistaken or somehow technically noncompliant date to actually cure that in time, to have the vote counted? Is that, in fact, what the record shows? Have I read the briefs correctly in that regard? That is correct. That is what the record shows, is that there's a variation of practice as to whether curing is permitted, and if so, how voters can actually cure their ballot. But that doesn't mean that the date requirement violates or implicates Anderson's verdict or somehow violates the Constitution. Because every county meets the constitutional minimum of providing every voter at least one opportunity to cast a valid ballot that complies with state law. That's what the Constitution requires, and that's what Anderson's verdict, to the extent it applies, would require as well, and that requirement has been satisfied. But here, Anderson's verdict doesn't even police, much less prohibit, this date requirement because it's simply the usual burden of voting. But even if it did, the date requirement easily satisfies that standard, and the district court erred in concluding otherwise. We have three minutes for the questions. You have reserved how much time? Three minutes. Thank you. Thank you.   Good morning, and may it please the court. My name is Brett Graham. I serve as a Deputy Attorney General in the Pennsylvania Office of Attorney General, and I represent the intervener appellant Commonwealth of Pennsylvania. In this matter, with the court's permission, I'll reserve one minute for rebuttal. Okay. Thank you very much. I'd like to begin, Judge Smith, with your question about what is the burden in this case, and I'd like to play that out a little bit. Before you do that, I'd like to follow up on Judge Smith's question to your adversary about the disuniformity in terms of opportunities throughout the Commonwealth for a voter to cure. And the reason why I want to ask you about that is one of the interests that's being proffered as a state interest in this case is orderly administration of elections. If there's not a uniform method for even how these dates are being treated, does that not reflect disorder instead of orderliness? Several points on this, Judge Schwartz. First of all, that is not the basis for the district court's reasoning. The district court- We're in de novo land, right? We're in de novo land, right? I understand that. Okay. And you weren't in the district court, right? I understand. Okay, then. Can you talk to me about- You could have been, right? Correct. Why not? Sorry? Why weren't you? Your Honor, the Attorney General is empowered but not required to speak up whenever there is a constitutional challenge. That's why civil and appellate rules of procedure speak only of notice. And here, the commonwealth's interests were adequately represented by June 18th when the district court issued its Rule 5.1 notice. Several parties- But suddenly they're not? It didn't have anything to do with the change of administration in the- I have no comment on that, Your Honor, but I would say that there's a basis both for the Henry administration to do what it did. There's a basis for the Sunday administration to do what it did. But returning- It's usually helpful to have a party or an entity who appears before us at this stage involved earlier at the district court level. Definitely helpful, but I would also point to page- I selfishly say. I would point to page 8 of the district court's opinion that says explicitly no commonwealth entity or controlled party has been sued in this case. The defendants were- We can debate this, but there's a rule that says if the constitutionality of state statutes is being brought, the state has a chance to come in and defend its statute. So the opportunity was presented for whatever reason. You preferred to come to Philadelphia. And mandatory notice to the attorney general also in most instances where there's a declaration of unconstitutionality by a Pennsylvania court. That's correct, Your Honor. Do that as it may. I'm here now. You're welcome. Thank you very much. I'm glad to be here. Tell me about why that's why the patchwork method by which the date requirement is even being- The date's being looked at. Opportunities to cure. Isn't that disuniformity and disorderly rather than the orderly administration? Two responses on this point, Judge Hortons. First, I don't believe there's disuniformity in terms of the application and the exercise of the date component of the declaration requirement. A uniform requirement for all voters to complete it and complete it accurately.  I understand what I'm talking about on the receiving end because this is about the orderly administration of elections, the election officials being county officials in the state, in the commonwealth rather. Why doesn't that demonstrate that this is not furthering orderly administration? Your Honor, I think to the extent that there's a concern about notice and cure or provisional balloting, I would point to outstanding challenges in the states, in state court, Gensler and Coalfield Justice, where the Pennsylvania courts are resolving this question. I think, importantly, both steps of the Anderson-Burdick analysis serve important interests in federalism and separation of powers, precisely for the point that there is no way to skip directly to interest balancing. It is for the legislature to write the rules for how one casts a vote. The federal constitution protects certain specific activity when it comes to voting, and states are the primary guardians of that liberty. But Anderson-Burdick requires us to conduct some balancing, right? Once you have satisfied step one, Your Honor, and what you have to do is determine the character and the magnitude of the burden. For the purposes of my question, though, I was putting us in Anderson-Burdick land, and I was moving to the state interest and seeing how that balances. Because I recognize your position from the briefing is we shouldn't even be doing Anderson-Burdick. This is a nondiscriminatory regulation. There should not be any balancing. There should be general deference to the legislature's decision. I'm with you. I understand your argument. Come with me for a moment and come on the balancing and tell me about – because I have questions on each of the interests that have been proffered. And one is this disuniform method of an opportunity to cure. And your response is, well, there are chances for people to bring lawsuits to challenge the disqualification of their vote. Is that what the specifications are? Correct. How is that administration of the elections? How is that an orderly administration of the elections when individual voters have to jump up when in other counties they don't have to do that because they got notice and an opportunity to cure? Well, I want to be clear on your question, Your Honor. Are you drawing a distinction between provisional balloting and notice and cure? I am not talking about provisional balloting at all. I'm talking about what happens when that ballot is received by a particular county according to the record. In some places, the county officials will notify the voter if there seems to be an apparent error or omission. In other counties, they don't. Right. I'm talking about a small number. There's a significant number where different things are happening. I understand, Your Honor. I'd like to clarify something, which is specifically that in both Genzer and Coalfield Justice, the SURE system, which counties use to keep voter rolls and tab ballots, in both of those cases, there was an automatic email being sent out to voters to notify them of a defect. And I clarified whether you were asking about provisional balloting because that's the thrust of Genzer. That's the thrust of Coalfield Justice, all of which speaks to the idea that the state has certain protections in place to make sure that everybody has an opportunity not only to vote but to challenge the decision of a county board to have it appealed. And the proper forum for those challenges are individual county boards that will make… But then, if that's the case, then why are individual county boards even going out of their way to give notice and some are not? You made representation about the SURE system. The record does not seem to suggest everybody who's had a problematic ballot, from the point of view of the omitted date or the wrong date, is getting notice. So, that's what the record says. Well, that's what the record says, Your Honor, but I would note that there was Genzer, which is essentially absent from the district court's rationale. And, frankly, the courts of this commonwealth are continuing to develop and breathe life into different sections of the election code, including Section 3157. What's going on with Baxter? I'm coming back to the interest. But what's going on with Baxter v. Philadelphia? The docket says briefing is done. Yes, Your Honor, and as a note, I believe the Pennsylvania Supreme Court scheduled oral argument here in Philadelphia in September. The Baxter case is an entirely separate challenge based on the free and equal clause of the state constitution. It's a challenge to the same provision, just based on a different area of law. Based on a different area of law. And, once again, I would refer back to it's not just the district court's characterization of plaintiff's claim here. It is really what the record shows, which is that plaintiffs ground their claim in the First Amendment here, where there is no expressive interest and there is no group attempting to associate for political ends. We can debate whether there's a lot of constitutional precedent that says there is a right to vote. There is a right to vote on equal terms with others. There is a right to vote as the legislature has prescribed. A problem for both the district court and my friends on the other side in this right to vote discussion is that whenever that phrase appears in case law, the sentence then continues. It does not usually stop at the word counted. And, frankly, the second step of Anderson Burdick makes a lot more sense once there is an actual constitutional injury at the first step, which I think is why this court in Mazo specifically listed out instances where Anderson Burdick does not apply, where the burden is de minimis, where there's a statutory right, where there's no relevant constitutional right. And, frankly, I'm not sure how to square that language in Mazo with the district court's rationale here. If the district court's rationale here is correct, then that sentence in Mazo doesn't make any sense at all. Really, what courts should be doing is saying, well, this is voting, this is elections, and, therefore, let's go right to balancing. Because any failure – Mazo doesn't say that, though. Mazo recognizes there are cases that do not implicate a requirement of balancing and cites a series of examples, right, in that your adversaries and the district court said, this is a case where Anderson Burdick is triggered. It goes to the mechanics of an election. It implicates a right that you're now representing doesn't exist. There is no First Amendment protected right to vote. There is no First Amendment right to have one's vote out of compliance with the rules prescribed by the legislature. So long as those rules are constitutional, correct?  Okay. Can I go back? I want to go to another interest with you. I'm here with you. Another interest. Oh, thank you. Let's talk about solemnity for a sec. I'd love to. Here we go. I'd like to ask you this. Supposedly, the date requirement facilitates the solemnity of the event. Put that aside for a second, and let's talk about all the other things someone who wants to vote absentee or vote by mail has to do. They've got to apply for it. They've got to get the ballot. They've got to complete the ballot. They have to read the instructions to make sure they put it in the secrecy ballot. They have to put it into another ballot. And then they actually have to sign the name below a declaration where they're making representations. They're a qualified voter. By the way, they're not saying it under penalties of perjury. There's no language in the declaration that says that. Am I right?  Okay. Doesn't that seem solemn enough? And the date doesn't seem to be adding anything to all of those other things. So how does the date facilitate the solemnity? And I'm using that in terms of a conveyance that the voter understands the importance of the act in which they're engaging. Your Honor, the General Assembly certainly did not think that it was solemn enough without the date. It is mandatory, and the Pennsylvania Supreme Court has told us so. But I'd like to address part of your question. We all know that. And we also all know, I think we do at this stage, the argument that we are in Anderson Burdick land, or except if you are not so sure of that, that we are. There is still a rationality component, isn't there? Of course. And so I would take my colleague's question a step further. What is rational about suggesting that simply writing in a date somehow conveys solemnity, if that's what is being stated by the Commonwealth, that the act, that the requirement conveys to the voter some sense of solemnity to the act and responsibility of voting? Explain that to me, because I have not gotten that from the very first time that I saw the word solemnity appeared as one of the three justifications advanced by the Commonwealth. I understand your question, Judge Smith. I'd like to take it in two parts. First, I don't think we should be even talking about this at all, frankly, simply because the... Indulge me. If I could very briefly explain my first answer, which is simply that courts conducting Anderson Burdick, including Anderson, including Burdick, including the Second Circuit in Luft, including the... Sorry, the Seventh Circuit in Luft and the Second Circuit in Lerman have looked at the scheme as a whole and the broader context of political availability. Rarely, if ever, has a court zeroed in to a part of a part of a part of a section of the election code. So this vantage point that is the premise of your question, I would slightly... I would discourage that vantage point based on my reading of the case law. Taking that vantage point for what it's worth and looking at solemnity, the instructions for filling out a mail-in ballot, as you mentioned, are various. For some, they might be complicated. Signing and dating something is an act of finality that is understood by many Pennsylvanians. It's what you do when you sign a check or you sign a contract. And here, it simply signals to the voter, your ballot is in not only the secrecy envelope, but the out-of-return envelope. You have completed all necessary steps. You can't go back and open it and change your votes. You have signed and dated and you are ready to put it in the mailbox. That is the meaning of solemnity in this case. But solemnity in the orderly administration of elections, as this court knows, is not the be-all, end-all of our government interests. No, it sure isn't. So let me take it to another factor because I don't see us getting anywhere with solemnity. And I understand solemn to convey to us in terms not simply of seriousness, but something almost spiritual in nature. Fraud, the discouragement of dishonesty. It was actually listed and argued in the briefs as number three. If I were writing a brief, it certainly would have been number one, especially these days when there is so much distrust that is out there, that has been encouraged, that has been spread in terms of the accuracy of elections. That certainly seems to me to have been the strongest of the three. So why weren't you arguing it that way? Your Honor, I think our larger point about the interest-balancing state, about Anderson's verdict step two, is that the district court demanded evidence. And so I think that was most plain with respect to the solemnity point and the orderly administration of elections point, because you're essentially going beyond rational basis and asking parties to prove with a record the wisdom of a given law. The fraud is actually sort of the easiest, I think, to attack, simply because the Mahaliot case shows it has been used in terms of a prosecution for voter fraud. Sure caught that, right? Sorry? Sure caught the fact that the alleged voter had passed away. Correct, but Your Honor, this is not the materiality case that the court was analyzing in Schmidt. There are interests beyond the tabulation of votes or the evaluation of qualifications. But my point is that fraud in and of itself, and irrespective of the Mahaliot question, does have some meaning, right? Absolutely. Does have some importance. Absolutely. It does have some meaning, and there is no amount of evidence or no quantum of evidence that.  And so what is the link between the Commonwealth's interest in discouraging fraud and requiring a mail-in voter from putting in a correct or somehow obliterated or otherwise erroneous or obscured date? Suppose a voter is trying to vote for someone else. They fill out, sign and date the ballot. And then later, when it comes time for tabulation, it appears to the county board that that date is impossible because that person was dead or had moved out of Pennsylvania, etc. But that's not going to be disclosed by the dating of when the person signed it. It's going to be disclosed as to their status on election day. Correct. Because the only date it counts, right? Correct, because we're beginning with the first order of business because we're on election day. Do we count the vote? But the Commonwealth's interests extend beyond election day and the tabulation of ballots to, okay, how do we find the person who submitted this fraudulent ballot? And if there is no date to indicate that the signature itself was impossible, then we have no point of reference by which we can say, oh, this is the person who … If you were to hold that it's unconstitutional to disqualify the ballot. We're not saying you can't ask for the date. We're not telling you how else you can use it. You just can't use an omission or a misstatement as it relates to the date to discount a ballot, to disqualify a ballot, to not count the ballot. Three different ways of saying the same thing. Use the date any other way you want, but you can't use that alone to disqualify because the date alone isn't telling you about the fraud itself. And we're not imposing anything that restricts your usage of the date. We're just saying that's not a ground to disqualify. Could the court do that? No, Your Honor. I don't think it could because that is essentially the analysis that you would be doing in 10101 under the Civil Rights Act. Now I'm not talking about materiality. I'm talking about that saves the statute in a way, acknowledging an interest, just saying you can't have the statute apply so broadly that it results in an unconstitutional injury to the voter. But, Your Honor, if you're suggesting that an error or omission is not material to determining qualifications, if that is the test that has been essentially grafted onto the- But right now I'm really saying about the fraud. Smith directed your attention to fraud. I'm talking about using the date for fraud purposes. Answering your question about whether or not the court could essentially excise the date component, which is not something that is present in any Anderson-Burdick application. I think that is essentially a redux of this court's opinion in Schmidt, which went the other way on the federal statutory question. And I'd like to- But it went the other way because the majority held that it had to do materiality, the materiality provision applied to the registration process, not the vote counting process. You're right. And at that point, Judge Schwartz, in your dissent, you wrote, today's ruling is a clear reminder that all voters- I'm aware of what I said. I was very clear and concerned about the fact that the voters know the consequence of noncompliance. But the principles out of that opinion with my colleagues in the majority teach us about what you can use the materiality provision for. The message of the dissent was simply to let the voters know this is the state of the law that existed at that moment. Your Honor, I would submit that the citizens of Pennsylvania are aware. First of all, I'd like to begin with this case in which the voter was allowed notice and cure with the Erie County Board of Elections. Beyond that, in the six years since the General Assembly passed Act 77, there has been a tunnel of litigation over this one provision. And indeed, in Baxter, in the run-up to the 2024 election, there was a voter who specifically neglected to cure their ballot in reliance upon a commonwealth court decision. The voters are listening. And furthermore, the executive has taken active steps to try to reduce confusion. But the larger point is that how we vote and how states structure elections changes over time. It is not static. That is why the commonwealth relies slightly less than the Republican committees on this concept of the usual burdens of voting. Because if you take a broader historical view, there is nothing usual about voting. It's constantly changing. And thus, federal courts and the federal judiciary specifically will only get involved, will only engage in interest balancing when there is a defined constitutional right at issue. The constitutional right at issue here is the right to vote out of compliance with the legislature's neutral instructions. And it doesn't exist anywhere in case law. The First Amendment surely does not relate at all here. As the Supreme Court has indicated, the ballot is to elect candidates. It is not a forum for discussion or expression. Okay, counsel, thank you very much. Thank you. Good morning, and may it please the court. Ms. Oman Kwanta on behalf of the Democratic Senatorial Campaign Committee, the Democratic Congressional Campaign Committee, AFT Pennsylvania, and Ms. Betty Eakin, appellees in this matter. Each year, Pennsylvania's election officials invite qualified eligible voters to cast their mail ballots only to discard thousands of those ballots based on a technicality, a missing or incorrect handwritten date on the ballot envelope. This court and others have agreed the date is obsolete. It is not used to prevent fraud. It is not used to determine qualifications. And it's not even used to determine whether the ballot arrived on time. The appellant's insistence on maintaining this practice over the objection of its own election officials is inexplicable or it accomplishes nothing. What's the burden of compliance or the injury using Anderson-Bernick language? So the burden is twofold. The burden is first identifying with precision the specific date that needs to appear on the envelope and having one's ballot rejected. That is also the burden. Your colleagues characterize that as a consequence of noncompliance rather than a burden. How do you respond to that? Well, court after court has recognized, including the Supreme Court, that the consequence of noncompliance is part of the burden. In the Anderson case, for instance, when analyzing the impact of Ohio's early ballot filing law, the Supreme Court noted that the inability of an independent candidate to launch a new campaign or to emerge was part of the burden. That is a consequence of noncompliance. Other courts have done the same. In New York v. Hudson in the Sixth Circuit, the court found that the 633 rejected absentee ballots. That was part of the injury, the fact that those ballots were rejected. Assume that you're correct, that that is part of the burden. With respect to the noncompliance rate, which we are told is really pretty small. One statistic that sticks out in my mind is what appellants tell us to have been 0.23% of mail ballots in the 2024 general election, which was 0.24%, 1% of the ballots. That's low. Should we give any weight to those figures that we've been provided? Yes, Your Honor. There are two reasons why those figures should be given weight. The first reason is they dwarf the figures that other courts, including the Sixth Circuit, have found to impose a burden. And I just mentioned the Northeast Coalition for the Homeless v. Hudson in the Sixth Circuit. The number of ballots that issued that were rejected there were 633 in one election and approximately 350 in another election. So in total, about a little over 900 ballots were rejected over two elections. Here we have a little over 14,000 ballots rejected over the course of two elections. So that's more than 10 times the number of ballots in New York, correct? So in sheer numbers, it's still a significant burden. But putting that aside, the number of ballots rejected is also evidence of the burden. Didn't the district judge herself find the burden here, characterize the burden here as being minimal? Yes, the district court did characterize it as minimal. We disagree with that characterization for two reasons. First, the district court did note that the disenfranchisement or the rejection of those ballots is a significant burden. The reason the district court found the burden to be minimal was because it was nondiscriminatory. But that analysis skips a step. As this court held in Mazo, in assessing the extent of a burden, this court considers whether it's nondiscriminatory, for sure, but also whether there are alternative means for an individual to exercise their right to vote or exercise their right to speak. I believe that your friends on the other side have said, or certainly that they would say, that if, in fact, this was a minimal burden, then the Anderson-Burdick equation really shouldn't be employed here. There should be no burden on the Commonwealth to come back. Well, that is simply incorrect. There are numerous cases that have applied the Anderson-Burdick standard to what a political council would consider a minimal burden, including the Supreme Court. Remember, in Burdick v. Takushi, the Supreme Court considered the burden to be minimal and slight, yet the court obviously, as its name suggests, applied the Anderson-Burdick test. And there are other cases as well in which the court considered the burden to be minimal, including Mazo, for instance. In Mazo, the court found the burden that issued to be minimal and still applied the Anderson-Burdick test. And there are others in which we've identified in our brief. But long story short, this distinction that the opposing council has created between burdens that do not reach the threshold of Anderson-Burdick analysis and, in effect, are not subject to any judicial scrutiny whatsoever, that distinction is pure fiction. They have not identified any cases that truly recognize that distinction. Instead, they take a reference or a phrase in Mazo out of context, the reference to de minimis burdens on constitutional rights, which they misread and misunderstand that statement. And the court in Mazo was talking about the specific types of constitutional rights that will implicate Anderson-Burdick. And in discussing de minimis burdens, what the court was not talking about the extent of the burden. It was talking about the proximity of the burden to the regulation itself, the proximity of the constitutional burden to the regulation. And it cited a case in which the court found that the law being challenged did not regulate the electoral process or regulate any constitutional protected activity. It cited Molinari, where the Second Circuit found that plaintiffs were not asserting a constitutional right to term limits, to certain term limits. That case did not implicate any constitutionally protected activity. The test that Mazo set forth to determine whether Anderson-Burdick is implicated is twofold. First, whether the challenge law implicates the mechanics of the electoral process. Here, the challenge law clearly implicates the voting process, whether a ballot should be counted that is quintessential Anderson-Burdick territory. The second is whether a constitutional right has been implicated or impacted here. And your adversary from the Commonwealth says there is no right implicated here by disqualifying a vote from a qualified voter that does not comply in full with the statutory requirements. Is he mistaken about how to articulate the right, or how would you articulate the right? He's absolutely mistaken about that. Again, this is another example of how appellant arguments distort even the Supreme Court's own standard in Anderson and Burdick. The Supreme Court specifically stated that each provision of the election code invariably burdens the right to vote. Thus, the burden analysis is not meant to exclude certain types of burdens or claims from judicial review. But whether the burden is minimal, whether it's slight, whether it's significant, which we believe it is here, that is all part of the Anderson-Burdick test. So the right, as you describe it, is the right to vote. As compared to the Commonwealth, which says it's the right, there is no right to have your vote counted if it's not in compliance with law. Are those two different rights, or is there no right to one and not the other? That's absolutely incorrect. You'll recall at one point poll taxes were required in order for a ballot to count. And according to appellant's argument, there would be no right to vote if an individual did not comply and pay that poll tax. But the Supreme Court soundly rejected that argument in Harper v. Virginia Board of Elections and has not looked back since. So clearly, just the simple fact that one did not follow the law or follow the requirement doesn't mean that they forgo the right to vote. Because that requirement itself could be unconstitutional. Precisely. Just like poll taxes were unconstitutional, and the failure to follow a poll tax does not mean you forfeited the right to vote. What would happen if the law was clear that in each county there had to be a uniform practice of giving notice to the voter whose ballot either omits a date, has a date that's got to be erroneous because it's more akin to the person's birth date, it's written in the European fashion with the month and date being flipped from the way it's done in the U.S.? Assume that were a requirement by law, that they can't think, they've got to have a uniform notice and opportunity to cure. Would that save the date requirement from constitutional challenge? I don't believe so. That may impact the burden analysis. Now, you may recall from our briefing and from the record below that plaintiff, Ms. Eakin, did have an opportunity to try to cure her ballot. As she tells it, she had to leap through an inordinate amount of burdens and hurdles to get that ballot cured. She was actually out of town. She was in Ohio for medical treatment and had to move mountains essentially to ensure that her ballot was counted. It would affect the burden analysis, but it also depends on the context structure of the cure itself. It would not impact the state interest, and that's what makes this case unique, is that there's absolutely no state interest that can justify this law because it's obsolete. I know you've argued that in the district court said there was no evidence of the state interest, but the Supreme Court and our court, and I think pretty much everyone understands that preventing voter fraud is a legitimate interest whether there's evidence of voter fraud or not. Why is that alone just not an interest that needs to be balanced under the Anderson verdict framework? Because it's unconnected in any way to the actual rejection of ballots for a missing or incorrect date. In the record below, none of the defendants, none of the 67 county defendants, were able to explain or identify any fraud prevention utility that comes from rejecting ballots because of a missing or incorrect date. It's not prevention, but the example that we have is enforcement of voter fraud laws with the Mahaliak case, right? So if the state says it's in our interest to not only throw out the votes of deceased voters but also to prosecute anyone who impersonates a voter, why isn't that a valid interest? So that goes to a distinction that has been lost in the Pounds briefing and one that Judge Schwartz mentioned earlier, in that the scope of the injunction in this case, which is similar to the injunction that plaintiffs sought below, is to enjoin county election boards from rejecting mail ballots for failure to enter the correct date or to enter a date at all. It's not to eliminate the date field from the ballot envelope itself. So because of that, any potential utility that appellants feel may be derived from having a date field still remains. Beyond that, what you heard appellants talking about is not necessarily an interest in regulating elections. It's an interest in collecting some data point that they may use later in perhaps criminal investigations or interrogations to perhaps solicit some type of settlement or plea. It's really unclear because they cite nothing in the record to support this, but it's really unclear what purpose the date served even in the Mahaliak investigation. There's just nothing but speculation about the purpose that the date served. Nonetheless, the interest that the court should take into account for the purpose of the Anderson-Burdick test is one that has to be connected to regulating elections. Because if it's not, then the state is not entitled to the deference that the Anderson-Burdick test allows. The reason the Anderson-Burdick test provides the state some deference and requires some balancing, doesn't just go straight to strict scrutiny, is because it recognizes that states have an interest in regulating the time, place, and manner of elections. States are tasked with that role in federal elections, and that's the only reason. But seeking some type of evidence to use in a potential plea is divorced from that. But prosecuting potential voter fraud, you're saying, is not connected to regulating time, place, and manner of elections because of the criminal prosecution as opposed to something about counting votes? Is that what you're saying? No, what I'm saying is the date on the ballot itself, there's just no connection between the date on the ballot envelope and prosecuting voter fraud. I understand their point to be, though, that the daughter of this deceased voter dated it, let's say, January 1st and when her mother had passed away in December. And so that showed that the daughter was actually doing something illegal. So if that were borne out, if that were true, then would the date be connected to the alleged fraud? It still would not be connected to the state interest aid vent here. Again, going back to the distinction, in Mihalyk, the Mihalyk case involved voting in the 2022 primary. And in that 2022 primary, the county boards had been enjoined from rejecting ballots because of a missing or an incorrect date. In other words, and that was because of the Migliore case and a subsequent order from the Pennsylvania Commonwealth Court. So in other words, even that investigation that appellants have pointed to as a state interest to support the rejection of ballots, it was not necessary to reject any undated ballots to get that information for the investigation. The Lancaster County, during that election in which the Mihalyk investigation arose, Lancaster County was counting undated and misdated ballots, just like every other county in Pennsylvania was because of a prior court order. And that goes to the distinction, again, that whatever interest that they have raised, none of it justifies the rejection of lawfully cast ballots with missing or incorrect dates. Did the district court err by requiring the state to produce any evidence of the interest as opposed to simply proffering an interest? Do you follow the difference I'm talking about? We don't believe the district court erred for two reasons. First, the district court's discussion of the absence, at least most of the district court's discussion of the absence of interest, came during the phase of the opinion where the court was assessing whether appellants had satisfied their burden in order to – satisfied their summary judgment burden, so to come forward with evidence. Do they have to come forward with evidence? Yes, they do. Even though this is like a – it's kind of like the case we just heard with legislative facts. Like, do they have a burden to come forward with evidence to support their interest? And not just state what the interest is. In this case, yes, they do. And I'll explain. In the Anderson verdict test, the amount of evidence that a state is required to come forward with is proportional to the extent of the burden. So if there is a minimal burden – and in some cases, courts will find that the state does not have to present any elaborate empirical evidence of their interest. But if there is a more moderate burden or significant burden, then the state does have to support those interests. In this case, we believe there is a significant burden. But second, as you may recall below, the Commonwealth did not appear below. So the interests being advanced were interests that were proposed by the RNC interveners. And in that case, when the state is not proposing the interest, when it's a political party with an interest in the outcome of the case in order to serve their own parochial interest in winning elections, as they stated in their motion to intervene, well, that requires – and that's entitled to more scrutiny because then you no longer have the countervailing state interest being expressed in the case and you no longer have the deference that's necessarily required. But we can't force the state or the Commonwealth to participate. And it was appropriate for the plaintiffs here, the plaintiffs to see the counties rather than the state. And we know there was mandatory notification to the Commonwealth. They declined to intervene. So why in those circumstances should we not credit the interest proffered by the defendants in this case even if those defendants are not the Commonwealth? Well, the court can credit the interest. But the question is whether the court should give those interests complete deference without the need for any evidence whatsoever or without the need for any showing that those are actual interests that are advanced by the state. And in this case, when the interests are not advanced by the state, the interests are actually advanced by the private party. We found no authority to suggest that the court owes those interests absolute deference without any type of evidentiary showing. Nonetheless, for the reasons I mentioned earlier, we disagree that the burden is minimal. And if the burden is not minimal because of the number of voters that have been disenfranchised, then the state is required to come forward with some type of support from their interests. The state itself? You mean like the Commonwealth of Pennsylvania as opposed to the defendants in this case? Well, both. It can't be that the Commonwealth is required to come forward because, practically speaking, the district court has no authority to force the Commonwealth to do anything as a non-party. Yes. So I may have misspoke when I said in saying that the state is required to come forward, whoever is presenting state interests in order to support the challenge law is required to come forward with some type of support when the burden is not minimal. When the burden is more than minimal, there needs to be some evidentiary support for the state interest being advanced in defense of the law. If there are no other questions, I'll just have one other. If we were going to agree with your colleagues across the aisle that a consequence from the omission, the risk of disenfranchisement, is a consequence, not an injury or burden. We're going to conclude that. What other burden or injury is left for us to consider in support of your client's position? Two responses to that. First, there is still the burden of identifying and entering the precise date and the precise format that the county deems to be permissible. And as you've seen from the record evidence, that varies from county to county. In some counties, entering the date in the European format, starting with the date, month, year, rather than month, date, year, results in the ballot being rejected. In other counties, it does not. In some counties, entering the month and leaving out the date results in disenfranchisement. In others, it does not. And it's utter chaos in terms of determining what is permissible from one county to another. Second, another way to look at the number of ballots being rejected is as evidence of the burden. In other words, the fact that there were thousands of ballots rejected is evidence that there is a burden in complying with this requirement. And that's how courts have looked. Complying correctly. Complying correctly. And that's how courts have looked at these types of cases when there are a number of ballots being rejected or when there are a number of registrations being rejected. As in Fish v. Schwab, the fact that there are thousands of individuals who sought to exercise their right to vote and have no reason to seek to disenfranchise themselves ended up not being able to vote. That is evidence that there is some burden. And then there's additional evidence in the record from expert testimony and expert declaration that demonstrated that there are disparities in the number of voters. There are disparities among voters who submitted rejected ballots. In other words, voters, black voters and Hispanic voters and elderly voters were more likely to submit rejected mail ballots than any other type of voter. And when you see those types of disparities and you see that the rejections are not equally distributed, that suggests that that's highly indicative of a burden. Otherwise, it would be equally distributed. But you didn't bring an equal protection claim. We did not bring an equal protection claim. And so going back to your point that we did not bring an equal protection claim, I think that's a little bit of a – we brought a claim under the First and Fourteenth Amendment. And the Supreme Court has recognized that these claims, the right to vote, undue burden on the right to vote claim can be located in the equal protection clause. So this isn't necessarily a disparate treatment equal protection claim. But what it does show, this is evidence of a burden of the right to vote because it shows that disparities fall along familiar lines. Those who are less resourced end up being more likely to cast a ballot that's rejected. And that's further evidence that there is a burden on voters in complying with this requirement, in addition to the fact that there are thousands and thousands of ballots being rejected. Thank you, counsel. Thank you.  Good morning, Your Honors, and may it please the Court. Jacob Boyer. I'm half of the Pennsylvania Department of State. I'd like to begin with a question Your Honor asked Judge Schwartz about the release and then a question Your Honor asked Judge Friedman about whose interest or whose presentation of the state interest here should be and can be credited. Your question about the proper release, Judge Schwartz, as to whether it is, as to the consequence, meaning that ballots can't be rejected or to the date itself, and soliciting that, is only to the consequence, and only could be to the consequence, given the defendants here are only the county boards of elections. The face of the declaration is governed by, and this will lead into my second point about who to credit, the Department of State, which is not a defendant here. As to who to credit on the representations of what the state's interests are here, I think the Court can take the explanations at face value, but still must question do they add up under the Pennsylvania Election Code and given the way Pennsylvania's elections are actually administered. And you have a number of state voices involved in this case. There's on the one hand, the Department of State, all 67 county boards of election. On the other hand, the Office of Attorney General and several state legislators who filed an amicus brief. And with all due respect to the Attorney General and state legislators. Not everybody's singing from the same songbook. Absolutely not. And with all due respect, what separates the two is only the Department of State and the county boards of election have a depth of understanding. Is it fair to say, so we all understand the functions of the Secretary of the Commonwealth, that as we have heard described in some of the case law, the responsibility for the mechanics of an election. That while the counties and their election boards are responsible for seeing that the mechanics of an election are carried out properly and in accordance with law at the county level. That that is the same obligation and responsibility of the Secretary of the Commonwealth at the Commonwealth level, at the state level, albeit in a more remote way. Yeah, I think it is right that the administration of elections is carried out entirely by the counties at the county level and the Department of State at the state level. And what I want to express is given those roles, the Department of State and the county boards have an understanding of the election code that, with all due respect, isn't shared by others. And I'd like to make a couple points to illustrate that this isn't an abstract distinction. Because the arguments you've heard today in the Attorney General and their briefing as well, as well as those from the legislators, betray that they don't actually get the election code right in many critical respects. So as to Your Honor's question about going back to what's the relief here, it is right to say the relief here is only that you wouldn't be able to reject out and not that the declaration date would no longer be a field that voters need to comply. So it therefore would still be available for this fraud detection measure should it matter. Correct. And the Attorney General response that says the relief, well, you have no idea if that's true because ultimately the counties, if this is a discretionary matter, might take away the date field and we don't know what they're going to do. That's simply wrong under the election code. The form of the declaration is prescribed. It's under 25 PS 3146.4 at the absentee ballot. 3150.14 is the mail ballot. It's uniform and is prescribed by the Department of State. And what appears on that ballot is governed by separate sections of the election code than those that govern the consequence. And so it's both that the Attorney General is wrong about the consequences, but also doesn't have the depth of the election code. To the point, Judge Freeman, that they're in a position, I think, to credibly articulate either the election interests or basically describe all the ways in which the election code applies here. By matter of statutory law in the Commonwealth, the date must appear on the ballot. And that obligation is administered by the Secretary of the Commonwealth and is distinct from the section that governs the consequences. So it's the broader point of, you know, you've heard from the Department of State. You've heard from the county boards who share the same level of familiarity, all of whom are online. The voice on the opposite side, my point is, don't have the same level of depth. And the arguments they are making at times portray that they don't actually understand the operation of the election code. If we were to determine that enforcement of the date requirement to disqualify a ballot is unconstitutional, does this do anything? Does it impact the rest of the statute in any way? No, Your Honor, it does not. And is that because the requirement to fill in a date remains? Correct, and it's governed by a completely different section. So there are sections of the election code, and the obligation to what instructions are given to the voter is 3146.6. As absentee, 3150.16 is to mail-in ballot. That governs what instructions are given to the voter. 3146.8 governs what counties do during the canvassing process and governs which ballots can or cannot be counted. So they are distinct under the election code. Let's talk about that. You used the language canvassing process. I'm looking at it. Ballot arrives, county official receives it. In some counties, according to this record, there's an opportunity to cure to the voter. If it appears to be an omitted or misstated date. In other counties, no action is taken, the ballot is discarded or not counted. One of the interests in an election code is orderly administration of elections. How is that interest furthered if the date requirement is being calculated in such different ways? And when I use calculated, I mean, you know, kind of focused on or has an impact depending on what county you're in. Do you agree that there is disorder from the enforcement of the date requirement to disqualify a ballot? I generally agree with the thrust of your question. I'll answer it in a more specific way. As we have said in our brief, it's not only true that the interest that the state might have here in rejecting ballots don't hold up, not a matter of evidence, not a matter of evidence, but under the law. They just don't square with the election code. I think we have also said, not only is that the case, but to reject ballots based on a declaration date review does indeed impede the effective administration of elections. And it's not just the notice and curiosity, which I think is perhaps more relevant, as my colleague said, to the question of burden. But it's true, and not to pat the department's head on the back, I think we've done a remarkable job with the redesign. And I think it has improved matters, but it's not perfect. We still saw in the 2024 general election, 4,500 voters failed to comply. We still saw that counties do not evenly decide what is correct or not, just to give some examples of where there is disuniformity. And this is different from notice and curiosity. This is just judging what is correct or not. Some counties decided, well, if you put both the date and month in the two boxes that we had created for the month and left those two boxes for the date, that was wrong. Other counties decided to scratch things off, that could be wrong. So there is still disuniformity, notwithstanding our best efforts to make this – under our powers to uniformly create the declaration, notwithstanding our best efforts to make sure everyone is treated equally. But the Secretary of the Commonwealth and I guess the Department of State have made – have taken a position on whether rejecting these ballots serves the election code, the purposes of the election code. But it seems to me that the people on the other side have asserted some interests that go beyond serving the purposes of the election code. And in your role today, do you have comments on those purposes, or are you speaking only to the purposes of the election code? So a couple comments. I absolutely agree that fraud prevention is a legitimate state interest. I don't agree that this case jeopardizes that. And part of the reason, as my colleague said, is the date field will remain irrespective of the outcome of this case to the extent it serves purposes beyond figuring out what ballot is valid or not. For which it serves no purpose, those interests will still be served. As my colleague mentioned, the one case where this has ever been identified as a possible piece of evidence for a reason that's outside the time, place, and manner of election, it was an election in which the voter had no reason to think the date would be necessary for their ballot to be counted and yet still filled it out. Ultimately for that election, dates were not necessary for ballots to be counted. So our core point is that it doesn't jeopardize fraud prevention, but we fully agree fraud prevention is a legitimate state interest. It's just not served by rejecting ballots based on declaration date errors. If I can make one final point about solemnity, because I think you asked some correct questions. Fascinating. Yeah. One other point I want to point out, and this is again evidence of the depth of understanding that the Department of State and the counties possess not shared by others. 25 PS 3553, which doesn't appear anywhere in the brief on the opposing side, says specifically the punishment that attaches should you falsely sign the declaration exists solely if you have signed without any reference to date. And the point is if it's solemn enough that you can be subjected to criminal punishment by virtue solely of signing. This is the General Assembly's judgment. Again, all of our arguments are grounded in the text of the election code. A date doesn't matter if it's solemn enough that you can be subjected to criminal penalties as you sign. It's certainly solemn enough that your vote can count if you haven't dated as well. Thank you, Your Honors. Thank you. Thank you, Your Honors. I'd like to address several points on rebuttal. First, on the threshold question, council has said that any rule that places any kind of burden on voting would trigger Anderson's verdict. And that's simply not correct because every voting rule imposes some difficulty or requires some effort in order to comply. They say we've cited no cases adopting the Meso line of reasoning, but that's incorrect as well. Look no further than Crawford. Crawford says on page 197, the United States Supreme Court, some burdens are neither so serious nor so frequent as to raise any question as to the constitutionality of the statute. We've also cited Luft v. Evers out of the Seventh Circuit. In that case, there was a challenge to a limitation on faxing or emailing absentee ballots to voters. And the Seventh Circuit declined to engage in an Anderson verdict analysis because it didn't think it was a plausible application of the framework due to the minimal nature of the burden in that case. You've asked council to describe what the burden is. Mr. Uzoma said it's identifying which date to write. We agree with the secretary. The 2024 redesign is remarkable. The secretary did a remarkable job. It clearly identifies which date there is to write. It has to be today's date, the date that the ballot is completed. And there are clearly marked boxes for the two-digit month, two-digit day, and the year is actually pre-populated. The plaintiffs did not put in any evidence below that voters are continuing to struggle with that particular issue or with this question about the American v. European dating convention. There was a representation that in the record, I think maybe we just discussed this on your opening comments, that there was evidence in the record concerning the 2024 redesign and how successful it's been. Because I think you represented that the numbers have gotten smaller from being discounted. So I do think there is evidence in the record that says there are still mistakes happening. There are still mistakes, but we don't know what those mistakes in particular were. Were those ballots rejected for noncompliance with the date requirement? Yes, and some of those could have been omission of the date rather than using an American or British format. I used mistakes to mean noncompliance with the date requirement. Sure, and I'm just making the point that because we didn't have, the district court didn't examine the evidence with respect to the 2024 redesign, much of the evidence that they're pointing to comes from prior elections where these boxes weren't populated and there weren't clear instructions. Mr. Uzoma also talked about the alleged disparity on African American, Hispanic, and older voters. But with respect to African American and Hispanic voters, there's actually no evidence of that in the record. They put in an expert report that tried to do a regression analysis about hypothetical counties, did not identify the race or educational attainment level of any voter. The expert conceded in deposition that he could not say that there had been any disparate effect from this on those subgroups. And the subgroup analysis is improper anyway, including under the Northeast Ohio Coalition for the Homeless case that they've repeatedly cited. And that case actually proves our point in another way. Mr. Uzoma pointed out that it was a small number of ballots in that case. But the Sixth Circuit's analysis turned on the difficulty of compliance, not the consequence of noncompliance. So that addresses, I believe, most of their burden points. Can I ask one question, please? Because it has been your position that there is a very consequential divide between the burden such as it is of filling in the date. And, of course, it must be the correct date. And that date portion may not be obscured or obliterated or somehow affected in the filling out process such that it appears, it does not appear clearly that there are indicia of noncompliance sufficient to disqualify the vote. And that the disqualification of the vote, the invalidating of the vote is merely a consequence. That is what I understand your position to be. But could it not be said that there is really an inextricable relationship between that act of filling out, the knowledge that it must be filled out accurately, completely, and in certainly a legible fashion. Maybe something could be added to that. And the knowledge or constructive knowledge on the part of the voter that if this is not done correctly, the consequence is the vote will not count. Is it not possible to conceptualize and describe the burden in that fashion? I suppose that relates to the burden. I think the burden still is the burden on compliance. And I think I would cite, Your Honor, to Justice Alito's opinion for the majority in Brnovich where he said that a rule that 98 percent of voters comply with is unlikely to pose a burden. Well, here we have a rule that more than 99 percent of even male voters comply with. And the majority of Pennsylvania voters don't even have to comply with it because they choose to vote in person instead. So when you look at from holistically, which the Anderson-Burdick framework requires this court to do, Pennsylvania's election code clearly complies with the Constitution. Let me address the state interest in the remedy just briefly, if I might, Your Honors. There is no burden on proponents of the law to come forward with evidence. MAISO shows that even when MAISO conducts the interest analysis, it doesn't point to any evidence. You have to identify an interest, but you don't need to come up with evidence in support. And the district court thought there was such an evidentiary burden. And I'll cite to Tevridge in the Ninth Circuit. And, of course, there was evidence of fraud from the Mahalia case, which was in the record here. So the district court's statement that there was no evidence to support that interest was simply incorrect. And finally, I think, Judge Schwartz, you asked about the remedy. If the court could enjoin enforcement of the date requirement without imperiling the rest of the election code. And here we part company with the Secretary of State, I think, has actually misstated what the lie is. As part of the 2019 enactment that created universal no-excuse mail voting. It's got a severability provision. I'm aware of that. That's why I asked. And that's before the Pennsylvania Supreme Court in Baxter. That's one of the issues that they've asked to be briefed. And it makes clear that if any application of any part of that law is held invalid with respect to any person or circumstance, the whole law goes. You're representing the language of the severability provision that even if an application. Any application to any person or circumstance, then all of Act 77 is eliminated. That means universal no-excuse mail voting is gone in Pennsylvania. And there were other provisions of Act 77 that modernize. That report will tell us whether that's. If it reaches that question. Presumably that was part of the compromise. Absolutely part of the compromise, as has been pointed out in the Baxter briefing. Baxter court may or may not reach that question, but it does. Obviously, it's one of the two questions. It's presented and it would be implicated if this court were to enter that kind of remedy. And it's also implicated by virtue of its own merits, the so-called merits question. Right. That's right. OK, thank you, counsel. All right. Your Honor, I would like to make three points in the limited time that I have. First, a correction. My friends on the other side represented that maybe the court should have some skepticism where political parties proffer state interests below. It was not only the Republican committees that appeared to be in defense of this date component. There was also the Berks County Election Board, Lancaster County Election Board. Second, a clarification. I remember our colloquy on direct judge Schwartz about the fact that you feel like you're being examined. I did indeed. Occupational hazard. I remember our colloquy about this being de novo review. But I would simply urge this court to consider the prospect that we're looking at an incomplete picture of how voting works and how voting is protected in the Commonwealth of Pennsylvania. There has been no discussion of constitutional provisions in Pennsylvania that guarantee absentee voting to particular populations. That is not this case. There has been no discussion of the state constitutional provision that provides for uniformity in elections. So to the extent that drives this case, there are questions elsewhere that need to be resolved. Finally, I'd like to just offer a concern, which is that I'm not sure what the next case looks like if the district court is affirmed in this instance. What I imagine it looks like is that this court is now the Supreme County Board of Pennsylvania. And if we have 50 voters who attempt to seal their ballots in a secrecy envelope but only apply the glue halfway and those votes are not counted, then we're back here again. We're in Anderson Burdick world. Is that a floodgates argument with a kind of interim suggestion to it? I'm not sure how that case would be distinguishable from this case, Judge Smith, because you would have an act that is prescribed by the legislature and the voter would essentially be saying, I have a right to vote in any manner. But they'll be presenting something different because the purpose of sealing the secrecy envelope is to ensure solemnity and to allow the vote to be counted. Senator, go ahead. You had to say that, didn't you? Sorry. But the right at issue is the right to have your ballot counted on equal terms with others in the jurisdiction. And that is why this court should – As long as those terms are constitutional. As long as those terms – and I'd like to return very briefly to – Very briefly. You asked for a minute. Very briefly to the poll tax question. She can be stingy when she wants to, trust me. But I can be very generous, too. I have no comment on that one, Judge Smith. On the poll tax question and any other of the many ways in which the right of political opportunity and access to the ballot have been challenged and there have been difficulties in this country, the neutral and de minimis requirement that one add a couple of digits next to a freshly signed signature is different in kind. This court should follow its own guidance in MAZO. It should review the cases cited in MAZO and see that there is no constitutional injury in this case. Thank you. You're welcome. To all counsel, thank you for your very helpful argument. We would ask a transcript of this argument also be prepared. We're going to ask the sides to just put the cost of that transcript, and the court will take the matter under review.